# EXHIBIT A

RECEIVED
SEP 0 2 2010
BY: _____

# Winship & Associates
### 40 Gardenville Parkway, Suite 200
### West Seneca, New York 14224

Alan C. Winship
Rheannon K. Yuscinsky

**CONFIDENTIAL REPORT**
**FOR PROFESSIONAL USE ONLY**

August 30, 2010

Feyi O. Gaji
Attorney At Law
36 Oak Street
Binghamton, New York 13905



Re: Gabriele E. Verrocchio
W&A File No: 05831

## VOCATIONAL EVALUATION

### REASON FOR REFERRAL

Gabriele E. Verrocchio was referred to Winship & Associates by Feyi O. Gaji, Esquire for a vocational evaluation and opinion regarding Mr. Verrocchio's earning capacity. Mr. Verrocchio was evaluated on August 26, 2010 in the offices of Feyi O. Gaji. Prior to starting, the nature and limits of the evaluation, including confidentiality, were discussed with Mr. Verrocchio. Mr. Verrocchio acknowledged that he understood and was willing to proceed.

### MEDICAL STATUS

Mr. Verrocchio reports that he was involved in a motor vehicle accident on December 23, 2006 during the course of his employment as a FedEx delivery driver. He was initially evaluated at Lourdes Hospital. He reports that he was diagnosed with whiplash.

Mr. Verrocchio reports that following the accident he developed pain in the cervical spine, lumbar spine, left shoulder and left and right elbows. He reports that he has developed recurrent headaches and visual problems. He has also been diagnosed with depression and anxiety.

Dr. Kammerman provided pain management care for a period of time. Pain management was discontinued and late 2008. Dr. Kammerman discussed the possibility of a trial and possible implementation of a neurostimulator. Dr. Kammerman had Mr. Verrocchio

Verrocchio, Gabriele E.
Page 2
August 30, 2010

meet with a medical representative to discuss this treatment option.

In January 2008, Dr. VanGorder performed left shoulder arthroscopic surgery,

Dr. Bennett has followed Mr. Verrocchio for neurosurgical care. In January 2008, Dr. Bennett performed a left ulnar nerve release. This was followed by a right ulnar nerve release in June 2008. Dr. Bennett has reportedly suggested an anterior cervical fusion. Mr. Verrocchio indicates that he has several levels of the cervical spine that are involved. He has seen numerous patients in Dr. Kammerman's office that have had less than successful fusion surgeries and he is reluctant to undergo this procedure, at least at the present time.

Dr. Kammerman referred Mr. Verrocchio to Dr. Williams for evaluation of visual disturbances. Dr. Williams has prescribed special lenses and frames to accommodate Mr. Verrocchio's photosensitivity. Dr. Williams has also had Mr. Verrocchio participate in vision therapy. Mr. Verrocchio continues to participate in this therapy two times per week.

Dr. Crawford has been providing psychotherapy for Mr. Verrocchio intermittently since 2007. Treatment is related to nonrestorative sleep, anxiety, depression and anger. Dr. Crawford has been working with Mr. Verrocchio with regard to loss issues involving diminished physical capacity, lifestyle changes and inability to perform his former job. Significant anger issues arose with his termination in September 2007. Dr. Crawford is presently seeing Mr. Verrocchio on a monthly basis due to a limited number of sessions that were authorized.

Mr. Verrocchio reports that he continues to have significant visual disturbances. His problems include double vision, photosensitivity tenderness and significant headaches that develop after reading for relatively brief periods of time (15 to 30 minutes). Utilizing a personal computer at home causes his eyestrain, eye watering and aggravate headaches.

Recurrent headaches remain a major problem. Headaches occur at a frequency of 3-4 times per week and last for several hours. Mr. Verrocchio feels that his headaches frequently emanate from his cervical spine and progress up his neck and over his head into the frontal area. He reports that he usually needs to recline and medicated with and fill. If he does not recline and take medication his headaches will progress to a full-blown migraine.

Mr. Verrocchio reports that he continues to experience pain in the left shoulder and both upper extremities. He reports that his left shoulder becomes more painful with activity. His pain is also aggravated by dampness and cold weather. He reports that he

Verrocchio, Gabriele E.
Page 3
August 30, 2010

experiences pain and cramping in his upper trapezius area on both sides with the left
being worse than the right. He reports that he experiences numbness and tingling in both
upper extremities with the right being worse than the left.

Obtaining restorative sleep is reported to be a major problem. Mr. Verrocchio reports
that some of his sleep difficulty comes from positional pain. Much of his sleep
deprivation comes from anxiety and racing thoughts that inhibits sleep.

Depression has become a significant problem. Mr. Verrocchio indicates that "I can't get
out of my own way" and "I'm going sideways". He expresses significant remorse,
sadness and anger over the loss of his physical stature and his termination by FedEx. He
reports that he is frequently angry and upset and irritable at home. He develops
intramuscular tension that serves to perpetuate his pain symptoms. Dr. Crawford has
provided videos and has worked with Mr. Verrocchio at progressive relaxation
techniques and visual imagery an attempt to assist him to deal more productively with his
chronic pain. While Mr. Verrocchio is aware of these techniques, his ability to practice
them seems to be limited to. He has developed some maladaptive coping behaviors.

Mr. Verrocchio reports that he attempts to stay as active as possible. He has a
membership at the Court Jester. He attends on average two times per week. He utilizes a
treadmill at a speed of 2.5 to 3 mph he also walks on a track and performs limited
resistive exercises. He is only able to tolerate two times per week as the activity
aggravates his pain.

Current medications consist of Cymbalta 60 mg daily, doxepin 50 mg daily, Celebrex
200 mg daily and Voltaren gel applied topically to his forearms. Mr. Verrocchio also
utilizes 1-2 tablets of Advil every 3-4 days. Mr. Verrocchio is concerned about long-term
use of prescribed and over-the-counter medication. He limits his medication intake as
much as possible.

REVIEW OF MEDICAL RECORDS

David E. Kammerman, M.D. initially saw Mr. Verrocchio in pain management
consultation on April 19, 2007. Dr. Kammerman offered the following opinions,
*"IMPRESSION:*
*1. Work related motor vehicle accident whiplash injury with postconcussive syndrome*
*and headache.*
*2. Left upper limb radiculopathy with cervical spondylosis at C5-6 and C6-7.*

*DISCUSSION: I advised the patient that he should continue taking Advil p.r.n. He*
*apparently didn't tolerate Ultram or Pamelor. I am interested in seeing the EMG results.*
*I also want to get a left shoulder MRI and request authorization for this. Also*

Verrocchio, Gabriele E.
Page 4
August 30, 2010

*authorization is being requested for cervical selective nerve root block times three. I have also referred him to chiropractics. Finally, I think some of the emotional and psychological issues associated with being out of work and having incapacitating pain should be addressed at the Southern Tier Pain Management Center and I am requesting authorization for this. This would be under the supervision of Dr. Marilyn Geller."*

On June 6, 2007, Dr. Kammerman performed a cervical facet medial branch block at C4-5, C5-6 and C6-7.

On July 24, 2007, Dr. Kammerman performed a Left C7 selective nerve root block.

On November 28, 2007, Dr. Kammerman performed bilateral C7 selective nerve root block.

On April 29, 2008, Dr. Kammerman noted, *"This patient continues with cervical pain and pain in both arms with tingling in the fourth and fifth fingers of the hands. His right hand was actually worse than the left right now. He may be developing bilateral cubital tunnel syndrome. He is considering surgical release of the cubital tunnels by Dr. Bennett which is reasonable. At this point we will continue on a combination of Vicodin, Topamax, Advil, Cymbalta. Hopefully he can get that through Dr. Bennett right now, since I am not offering further treatment at the moment. If his symptoms are intractable related to the C7 nerve root involvement we can certainly consider repeat selective nerve root block at C7. However, this should be decided after his cubital tunnel surgery. I will see him back by referral from Dr. Bennett. He does have some decreased sharp, dull discrimination in the C7 dermatomes bilaterally. There is tenderness over the cubital tunnels bilaterally."*

Dr. Kammerman Evaluated Mr. Verrocchio again on June 2, 2009 and noted, *"IMPRESSION: TBI with posttraumatic headaches/ulnar nerve injury status post bilateral ulnar nerve transposition with residual numbness in the ulnar nerve/C7 distribution/cervical pain syndrome facet joint mediated.*

*PLAN: I really think the patient is disabled and would not be able to do any kind of gainful employment. I have filled out some paperwork for him in this regard, which will be sent to his attorney. I think the patient should follow-up with neurology at some point. I do think that the possibility of a spinal cord stimulator placement might be helpful in regards to managing his neck and headache pain. He will discuss this further with Dr. Bennett."*

Records from Southern Tier Pain Management Center were reviewed. Marilyn I. Geller, Ph.D. initially evaluated Mr. Verrocchio on April 24, 2007. This was followed by a physical therapy evaluation performed on April 26, 2007 by J. Todd Mansfield, PT, DPT,

Verrocchio, Gabriele E.
Page 5
August 30, 2010

OCS.  Dr. Geller noted, *"Mr. Verrocchio is seen as a very appropriate candidate for participation in the Motor Vehicle Accident Treatment Program @ STPMC.  In consideration of the present cognitive symptoms and appears that a neuropsychological evaluation will be appropriate to further identify areas of difficulty and directions for remediation.*

*Considering the nature of his pain and the symptoms he is experiencing, the patient would do well to learn a multiplicity of techniques to assist in altering his perception of pain and to focus personal goals away from pain and disability.*

*There are clearly numerous adjustment problems resulting from the injury that need to be addressed in the pain program.  Specifically, the patient needs to learn to deal with changing roles and status, issues of loss, and fear of the future.*

*Additionally, he needs to learn to control muscular tension and physiological stress, which often aggravate chronic pain.  This could be accomplished through training in a variety of skills including biofeedback therapy, hypnosis, relaxation training, visualization and injury, and stress management techniques.*

*It is also important that his situational depression and sleep disturbance receive immediate and direct attention.  It would be best to combine behavioral skills training and psychotherapy with appropriate pharmacological management.*

*It is felt that through participation in the program, this patient will be able to make the necessary adjustments to his physical limitations, would learn a variety of strategies and approaches to more effectively manage the pain, would be able to increase activity levels, improved sleep patterns, decreased situational depression, and be able to realize maximum physical functioning.*

*It is also hoped that this program will represent a significant step toward Mr. Verrocchio resuming a more pain-reduced level of functioning, and a more productive and happy lifestyle."*

Angela L. Crawford, Ph.D. has provided psychotherapy services for Mr. Verrocchio for several years.  Treatment notes through June 7, 2010, reflect ongoing issues relating to depression, anxiety, stress, sleep difficulties and anger.

The records of Matthew Bennett, M.D. and Thomas VanGorder, M.D. were reviewed.

On July 20, 2007, Dr. Bennett's office noted, *"Mr. Verrocchio should continue to be considered as 75% or markedly disabled due to his persistent symptoms.  It has been*

Verrocchio, Gabriele E.
Page 6
August 30, 2010

*recommended that he not return to any work at least until his next office visit here, which
is July 25, 2007.*

*As for Mr. Verrocchio's left shoulder injury, Dr. Bennett has documented in his note from
June 14, 2007 that he believes these symptoms in the left shoulder are secondary to the
automobile accident in question.  As for the exact nature of injury and treatment
options we will defer this to his orthopedic surgeons at this time.  We have referred him
to Tier Orthopedics for follow-up and treatment of his left shoulder injury."*

On January 18, 2008, Dr. VanGorder performed examination under anesthesia, left
shoulder arthroscopy, decompression, partial anterior acromionectomy and
acromioclavicular joint resection, and distal clavicle excision.

On May 2, 2008, Dr. Bennett noted, *"IMPRESSION:*
*1.  Bilateral cubital tunnel syndrome, right greater than left.*
*2.  Neck pain with some occipital pain, now with trigger points.*
*3.  C5-6, C6-7 cervical spondylosis with left-sided neural foraminal stenosis status post
C7 selective nerve block with good improvement in upper extremity symptoms.*
*4.  Back pain.*
*5.  Status post left shoulder decompression by Dr. VanGorder.*
*PLAN: We discussed the different options here today.  In terms of the neck pain and
trigger points, we talked about trigger point injections.  We discussed the risks, possible
benefits and alternatives, and he would like to proceed.  Under the usual antiseptic
technique, the left paraspinal region, left trapezius, left levator scapular region was
injected with trigger point injections.  A total of 4 cc of 1% lidocaine and 40 mg per cc
Depo Medrol were injected evenly between all muscle groups.  He tolerated this well.*

*We talked about cubital tunnel syndrome today.  He would like to proceed with
decompression and subcutaneous transposition.*

*Will continue with physical therapy.  He is okay for light duty.  No lifting greater than 10
lbs and no pushing, pulling, carrying, bending or stooping.  He had no questions and was
in agreement with this plan."*

On July 17, 2008, Dr. Bennett performed cubital tunnel decompression, right elbow and
transposition of ulnar nerve subcutaneously.

On December 8, 2008, Dr. Bennett performed left cubital tunnel decompression with
ulnar nerve transposition at the elbow.

In late 2008, Dr. Bennett discussed the possibility of an occipital stimulator.

Verrocchio, Gabriele E.
Page 7
August 30, 2010

On March 18, 2009, Dr. Bennett noted, *"Never the less he continues to have severe pain and remains 100% disabled according to Comp criteria given his multiple problems."* Dr. Bennett has continued to indicate through his most recent report of June 23, 2010, that Mr. Verrocchio remains totally disabled.

The records of Gary J. Williams, D.O. were reviewed. On July 17, 2008, Dr. Williams offered the following opinion, *"I examined Gabriel Verrocchio, for the first time, on July 2, 2008. It was reported to me at that time that Mr. Mr. Verrocchio was hit from behind while driving his FedEx vehicle on December 23, 2006. He has had headaches since the accident. Although the headaches are a little better, he is not sure if this is due to a resolution of them were as a result of the medication that he is taking two ameliorate the discomfort. Since the accident he has been making slow progress. One of the most significant difficulties he experiences is with reading. The longest he can read is 15 to 20 minutes before the reading material gets blurry and he has incapacitating fatigue. He starts losing his place and finds it difficult to concentrate on his reading long before that period of time.*

*Mr. Verrocchio has a marked convergence insufficiency, which is a significant component of his reading problem and difficulty attending while reading. This is compounded by the fact that he has some focusing difficulties at near and will require glasses for reading. The glasses will not address the convergence insufficiency, but are necessary for him to participate in Vision Therapy, which is the recommended course of treatment for this condition. Convergence insufficiency is a common sequelae from head trauma and, since all accident victims are not the same, it is difficult to predict how many sessions of therapy will be required to adequately treat this condition. My prognosis is that Mr. Verrocchio will be successful after approximately 40 sessions of in-office therapy, combined with reinforcement using home practice."*

Dr. Williams' most recent correspondence is dated July 22, 2010, at which time Dr. Williams noted, *"I have reviewed the job descriptions which you sent. We do not feel that any of these jobs are impossible for Gabriele Verrocchio, but there would need to be important accommodations in place for these jobs not to be detrimental to Mr. Verrocchio's health and for him to be able to perform efficiently to meet the needs of his employer. At least in the beginning he would need to be able to work limited hours. It is possible that these hours may be able to be expanded over time, but that can only be determined empirically.*

*Due to his injury, Mr. Verrocchio has extreme photophobia. This is one condition that is unlikely to improve over time and needs to be accommodated with special lenses and frames whenever he is in conditions where the lighting cannot be reduced to his comfort level. After an injury like Mr. Verrocchio's, vision and other sensory symptoms are often hypersensitive and he will need hearing protection particularly if he needs to go out into*

Verrocchio, Gabriele E.
Page 8
August 30, 2010

*the warehouse to avoid overstimulation and its consequences. Due to the physical consequences of his injury, he needs an ergonomically designed workstation, but even with that he will need to get up frequently to move. This is obviously true of other people, but Mr. Verrocchio's needs are greater based on his problems. If his hours are limited, he cannot be expected to work overtime and the times and shifts he works need to give him time to make an adequate recovery before his next workday. I hope that these recommendations are expressed in the manner in which you can easily translate them to his former employer in their lawyers and that the outcomes for Mr. Verrocchio will be positive."*

Aamir Rasheed, M.D. saw Mr. Verrocchio in neuromedical consultation on October 19, 2009. Dr. Rashid noted, *"The patient is a 47-year-old white male who was involved in a motor vehicle accident in 2006. The patient has had intermittent headaches as well as neck and low back pain since the accident. From the description, I feel that one is looking at a posttraumatic headache with migrainous features. There appears to be some aura superimposed due to rebound component due to the use of hydrocodone over a year or so. His present neurologic examination does not reveal any focal or corticospinal issues. I spent some time talking to the patient and his wife regarding the above-mentioned issues. At this time, given that there has been no improvement with Topamax, I advised him to discontinue the medication. For prophylaxis he will be started on Depakote ER at a dose of 250 mg at night, which he will take for about a week and then increase it to 500 mg at night. Depending on the response, I will make further adjustments. I may have to consider trying him on a muscle relaxant, but we will wait to see how he responds to the above medication. I will continue to monitor him and keep you advised."*

Dr. Rasheed evaluated Mr. Verrocchio again on January 19, 2010. Dr. Rashid noted, *"The patient is a 47-year-old white male with posttraumatic headache with migrainous features. Given that there has been no significant change in headache frequency, I have decided to push up on the dose of doxepin to 25 mg. He will take that for about a week and then increase it to 50 mg. depending on the response, to make further adjustments. I will continue to monitor him and will keep you advised."*

Jin Bai Kim, M.D. performed a physical medicine and rehabilitation (physiatry) Independent Medical Evaluation of Mr. Verrocchio on July 20, 2007. Dr. Kim concluded, *"IMPRESSION:*
*1. Chronic cervical and back strain syndrome.*
*2. Shoulder strain/contusion on the left.*
*3. r/o chronic myofascial pain.*

*DISCUSSION:*
*1. Diagnosis? As stated above.*

Verrocchio, Gabriele E.
Page 9
August 30, 2010

*2. Prognosis? Fair.*
*3. Degree of disability: Moderate partial.*
*4. Causal relationship to injury? Claimants present condition appears to be causally related to the injury on 12-23-06.*
*5. Claimant can return to work at this time? I don't think the claimant can return to work at this time as a truck driver.*
*6. Ability to return to work light duty? Claimant could return to work light duty using mainly right upper extremity if available.*
*7. His depression and psychological issue costly related to the work accident involving the MVA on 12-23-06? Claimant could have post-traumatic stress syndrome after the MVA and these issues could be causally related to work accident involving the MVA on 12-23-06, in my opinion.*
*8. Further treatment needed? Claimant still has quite limited flexibility and component of myofascial shoulder pain. Claimant could have benefited from further PT emphasizing on myofascial pain management and improving his flexibility with neck and back and left shoulder along with the Claimant's education2-3 x week for the next 6-8 weeks, in my professional opinion.*
*9. Our EMG & MRI of the left shoulder necessary? EMG & MRI of the left shoulder are necessary, and these have been done already?*

Arlen K. Snyder, M.D. performed an orthopedic Independent Medical Evaluation of Mr. Verrocchio on April 30, 2009. Dr. Snyder offered the following opinions,
*"CONCLUSIONS: Been asked to comment upon its degree of disability. I do believe that he has a moderate-marked degree of disability and that any work restrictions would be primarily sedentary in nature and that he would have to be able to change positions as needed. He also should not lift more than 10 to 15 pounds and not do any repetitive flexion and extension. As far as the cognitive disability that he claims, that is outside of my expertise, and I believe to the psychologist to render an opinion regarding his work ability as pertains to his cognitive factors."*

Bal M. Nemani, M.D. performed a psychiatric Independent Medical Evaluation of Mr. Verrocchio on July 21, 2010. Dr. Nemani offered the following opinions,
*"DIAGNOSTIC IMPRESSION:*

*AXIS I: Major Depression, single episode, moderate 296.22*

*AXIS II: No diagnosis has been made.*

*AXIS III: Neck, shoulder and various other pains related to MVA.*

*AXIS IV: All these painful situations after the accident, including his dealing with his employer.*

Verrocchio, Gabriele E.
Page 10
August 30, 2010

*AXIS V: His GAF score at this point in terms of psychiatric disability is 50. There may be some additional impairment due to his physical disability, which I'm not considering in this assessment at this time.*

<u>*QUESTIONS:*</u>

<u>*Diagnosis/Prognosis:*</u> *The diagnosis made was Major Depression, single episode, moderate. His prognosis should be fair. He should be making improvement with appropriate treatment.*

<u>*Has claimant reached Maximum Medical Improvement?*</u> *No he has not reached Maximum Medical Improvement at this time.*

<u>*Has claimant reached Maximum Medical Endpoint?*</u> *No he has not reached Maximum Medical Endpoint at this time.*

<u>*Permanency?*</u> *The diagnosis of depression is not permanent. It should be temporary. It should be treated and can be treated."*

Additional medical records reviewed as well as from Lourdes Hospital, Lourdes Rehabilitation Department, Southern Tier Imaging, Michael J. Wasco, M.D. and Charles Reina, M.D. IME report of June 23, 2010

<u>EDUCATION AND TRAINING</u>

Mr. Verrocchio attended Binghamton North High School through graduation in 1981. He reports that he has not participated in any formal post high school education or training.

<u>EMPLOYMENT HISTORY</u>

FedEx began employing Mr. Verrocchio in December 1983 as a route delivery driver. Mr. Verrocchio was unable to return to work following the accident of December 23, 2006. Following an Independent Medical Evaluation. FedEx required that Mr. Verrocchio returned to work. Mr. Verrocchio was terminated on September 17, 2007 for not returning to work. Mr. Verrocchio's Personnel File from FedEx was reviewed.

The City of Binghamton employed Mr. Verrocchio as a laborer during 1981 through 1983. Mr. Verrocchio reports that he also attempted self-employment as an automotive body repairperson. His attempted self-employment was not successful.

Verrocchio, Gabriele E.
Page 11
August 30, 2010

TRANSFERABLE SKILLS

The job duties performed by a route delivery driver DOT # 292.353-010 are considered to be semiskilled. Skills/competencies that one would develop in this occupation involve the ability to:

- Drive truck to deliver such items to customer's home or place of business.
- Record transactions on customer receipt.
- Write customer order and instructions.
- Record deliveries information on delivery record.
- Inform regular customers of new products or services.
- Listen to and resolve service complaints.
- May load truck.
- May issue or obtain customer signature on receipt for pickup or delivery.
- May clean inside of truck.
- May perform routine maintenance on truck.

The job duties performed by a route delivery driver fall within the medium strength classification. (Exert force of 20-50 lbs. occasionally, 10-25 lbs. frequently, or up to 10 lbs. constantly.)

OTHER PHYSICAL DEMANDS (that may be encountered):

CL - Climbing - Not Present
BA - Balancing - Not Present
ST - Stooping - Occasional
KN - Kneeling - Not Present
CR - Crouching - Not Present
CW - Crawling - Not Present
RE - Reaching - Frequent
HA - Handling - Frequent
FI - Fingering - Occasional
FE - Feeling - Not Present
TA - Talking - Frequent
HE - Hearing - Frequent
TS - Tasting/Smelling - Not Present

VISION:

NE - Near Acuity - Occasional
FA - Far Acuity - Frequent
DE - Depth Perception - Frequent
AC - Accommodation – Occasional

Verrocchio, Gabriele E.
Page 12
August 30, 2010

CV - Color Vision - Frequent
FV - Field of Vision - Frequent

COMMON ENVIRONMENTAL WORKING CONDITIONS (to which the worker is exposed):
WE - Exposure to weather - Occasional
NO - Noise Intensity Level - Loud

During the course of his past employment Mr. Verrocchio has demonstrated the following aptitudes.

| General Learning Ability | Average | 34th to 65th percentile |
| Verbal Skill | Average | 34th to 65th percentile |
| Numerical Skill | Average | 34th to 65th percentile |
| Spatial Perception | Below Average | 10th to 33rd percentile |
| Form Perception | Below Average | 10th to 33rd percentile |
| Clerical Perception | Average | 34th to 65th percentile |
| Motor Coordination | Average | 34th to 65th percentile |
| Finger Dexterity | Below Average | 10th to 33rd percentile |
| Manual Dexterity | Average | 34th to 65th percentile |
| Eye/Hand/Foot Coordination | Average | 34th to 65th percentile |
| Color Discrimination | Below Average | 10th to 33rd percentile |

Temperament factors (situations to which the worker must adapt) demonstrated by Mr. Verrocchio during the course of his past positions are the ability to:

- Influence people in their opinions attitudes, or judgments about ideas or things.
- Deal with people beyond giving and receiving instructions.

Transferable skills are[1] *"Skills that can be used in other work (transferability) ... the skills that can be used in other jobs, when the skilled and semi-skilled work activities you did in past work can be used to meet the requirements of the skilled and semi-skilled work activities of other jobs or kinds of work. Transferability is most probable and meaningful among jobs in which (i) the same or lesser degree of skill is required; (ii) the same or similar tools and machines are used; and (iii) the same or similar raw materials, products, processes or services are involved."* A thorough Transferable Skills Analysis (TSA) is one of the foundations of an informed vocational opinion. A Transferable Skills Analysis was performed using the Oasys Transferable Skills Program. Certain assumptions were made regarding Mr. Verrocchio's residual functional capacity and abilities based on medical records reviewed and his past work history. The results of the TSA are as follows:

---

[1] Reference Part 404 Code Of Federal Regulations, 20:1995

Verrocchio, Gabriele E.
Page 13
August 30, 2010

TRANSFERABILITY TABLE

| Match Type | Selected | Transferability | Training |
|---|---|---|---|
| Closest | 1 | Excellent | Minimum, Familiarization Only |
| Good | 3 | Good To Moderate | Some in Tools and/or Materials |
| Fair | 0 | Fair, Develop a Plan | Must train in Tools and/or Materials |
| Potential | 0 | Low, Plan Development and Training | Must train in Tools and Materials |

MATCH LIST

| Code | Occupation | Industry | SVP | Str | O*NET | Level |
|---|---|---|---|---|---|---|
| 292.353-010 | Driver, Sales Route | Retail Trade | 3 | M | 53-3031.00 | Closest |
| 259.357-038 | Tobacco-Warehouse Agent | Business Services | 3 | L | 41-3099.99 | Good |
| 299.677-010 | Sales Attendant | Retail Trade | 2 | L | 41-2031.00 | Good |
| 299.647-010 | Impersonator, Character | Any Industry | 2 | L | 41-9012.00 | Good |

Mr. Verrocchio does not retain sufficient residual functional capacity to perform either of the semiskilled occupations identified.

## PSYCHOSOCIAL STATUS

Gabriele Verrocchio is 48 years of age. He is married. The Verrocchio's reside in Binghamton, New York. Mr. Verrocchio possesses a New York State driver's license and is capable of driving an automobile. Mr. Verrocchio has 3 daughters. His 22-year-old daughter resides with Mr. Verrocchio and his current wife and his 18 and 17-year-old daughters reside with his former wife.

Mr. Verrocchio reports that he has considered vocational rehabilitation through VESID. He is not currently active with this agency as Dr. Bennett considers him to be totally disabled. Mr. Verrocchio has been accepted for Social Security disability. Mr. Verrocchio has limited computer skills. He has never taken any formal computer course. He does utilize a computer at home, primarily for researching things on the Internet.

## IMPRESSIONS

Earning capacity "is the individuals potential to earn in the labor market and/or capacity to increase his or her earnings potential, and not merely direct compensation of pre-accident earnings to post-accident earnings, that should be measured."[2] Records from FedEx indicate the following earning history for Mr. Verrocchio: 1988 $32,809.19; 1989 $34,157.56; 1990 $34,934.43; 1991 $36,048.59; 1992 $40,730.64; 1993 $42,143.24; 1994 $49,915.70; 1995 $47,423.09; 1996 $45,875.16; 1997 $49,045.09; 1998 $47,655.93; 1999 $48,985.57; 2000 $51,625.57; 2001 $49,963.67; 2002 $57,425.08; 2003 $61,551.40; 2004 $58,244.99 and 2005 $48,883.00. In 2006, the year of Mr. Verrocchio's disablement he earned $52,959.16 through December 23, 2006. In my

---

[2] Sawyer, Horace, PhD and Deutsch, Paul, PhD A Guide to Rehabilitation, AHAB Press Inc., 2002. P. 8.2.

Verrocchio, Gabriele E.
Page 14
August 30, 2010

professional opinion, Mr. Verrocchio's historical earnings provide an objective indication
of his preinjury earning capacity.

Post injury, Mr. Verrocchio continues to experience significant exertional and non-
exertional impairments that affect his ability to sustain gainful employment. Arlen
Snyder, M.D. *"any work restrictions would be primarily sedentary in nature and that he
would have to be able to change positions as needed. He also should not lift more than
10 to 15 pounds and not do any repetitive flexion and extension."* Dr. Williams has
indicated that Mr. Verrocchio will require accommodations for photosensitivity and
related sensory symptoms. Dr. Bennett has noted that Mr. Verrocchio remains totally
disabled.

Approaching Mr. Verrocchio's ability to return to work based solely on his residual
functional capacity does not allow for the consideration of the nonexertional impairments
that Mr. Verrocchio is exhibiting relating to chronic pain, depression, anxiety and
nonrestorative sleep. These issues will have an impact on Mr. Verrocchio's
employability. Fischler and Booth[3] have suggested the following vocational strategies
and accommodations for individuals with chronic pain disorder.

- Coordination among supervisor, physician, rehabilitation professional, and other
  involved professionals, due to complexity of the disorder.
- Flexible scheduling to accommodate fluctuations in physical symptoms.
- Routine, predictable tasks to accommodate perceived physical limitations.
- As few deadlines and time pressures as possible to minimize stress related
  symptom flare-ups.
- To work at his or her own pace, and not as part of a team, to accommodate their
  regular schedule.
- Enforcement of clearly expressed and agreed upon standards for quality and
  quantity of work.
- Enforcement of clearly expressed and agreed upon limits on extra breaks and time
  off.
- Enforcement of clearly defined and expressed limits of workplace
  accommodations.

In my professional opinion Gabriele Verrocchio is not capable of sustaining gainful
employment based on the exertional and nonexertional impairments that Mr. Verrocchio
continues to experience. Until such time as these issues have been resolved, or at least
some meaningful progress has been made in reducing these the effect of impairments,
Mr. Verrocchio will not be capable of sustaining gainful employment in the future.



---

[3] Vocational Impact of Psychiatric Disorders A Guide for Rehabilitation Professionals, Gary L. Fischler,
Ph.D., Nan Booth, MSW, MPH, Aspen publishers, Inc., 1999

Verrocchio, Gabriele E.
Page 15
August 30, 2010

Dr. Kim, following his evaluation of Mr. Verrocchio on July 20, 2007, noted, *"Claimant could return to work light duty using mainly right upper extremity if available."* Correspondence of August 24, 2007, from Steven Donnelly of FedEx directed Mr. Verrocchio to return to work based on the restrictions in the IME report as part of the FedEx Temporary Return to Work Policy.  Mr. Donnelly's records indicate that Mr. Verrocchio contacted Mr. Donnelly on August 29, 2007, expressing concern that his treating physicians had advised him against a return to work. A note from Dr. Bennett's office dated August 16, 2007 indicates that Mr. Verrocchio would be totally disabled until his next examination on October 5, 2007. A note of August 30, 2007, from Dr. Kammerman's office indicates that Mr. Verrocchio was unable to return to work and would be reevaluated in 4 weeks.  These notes from Dr. Bennett and Dr. Kammerman where faxed to Mr. Donnelly's attention on August 30, 2007. Mr. Donnelly responded by sending out a second letter of September 4, 2007, again advising Mr. Verrocchio to return to work with temporary restrictions and limitations.  On September 14, 2007, Mr. Donnelly sent a letter to Mr. Verrocchio advising him of his termination from FedEx.  It is evident from the ensuing treatment that Mr. Verrocchio has received that all of the medical issues  that he was and continues to experience had not been identified at this point in time in 2007.

Records from FedEx display a complete lack of meaningful dialogue with Mr. Verrocchio in an attempt to facilitate a return to work.  There is an obvious discrepancy between the opinion of Dr. Kim and the opinions of Mr. Verrocchio's treating physicians Dr. Bennett and Dr. Kammerman.  Rather than discuss this discrepancy and to come to a mutual agreement as to how to proceed, Mr. Donnelly terminated Mr. Verrocchio's employment.

Mr. Verrocchio's concern regarding a return to work against the medical advice of his attending physicians is understandable. This is especially true given the anxiety that Mr. Verrocchio experienced at the time and continues to experience. There was no dialogue with regard to what position or job tasks he would be performing. There was no dialogue entered into with regard to possible accommodations that could be afforded to Mr. Verrocchio.  I have reviewed several job descriptions from FedEx.  These positions are titled customer service representative, part-time billing clerk, owner operator recruiting manager and supplemental field office.  It is my professional opinion that the physical demands of these positions are inconsistent with the physical parameters established by Dr. Kim.  An objective method of moving beyond the discrepancy between Dr. Kim and Dr. Bennett and Dr. Kammerman would have been to refer Mr. Verrocchio for a Functional Capacity Evaluation.  The physical therapist or occupational therapist performing this evaluation would have been capable of assessing Mr. Verrocchio's residual functional capacity specifically as it relates to the job functions that Mr. Verrocchio would have been performing upon returning to work.  The therapist would have been capable of suggesting means of reasonable accommodation if it was felt that

Verrocchio, Gabrielle E.
Page 16
August 30, 2010

Mr. Verrocchio could not perform all of the intended job functions.  Dr. Kim is a physiatrist and certainly is familiar with these types of evaluations.  The case manager from IntraCorp, referenced in Mr. Donnelly's notes would also have been familiar with Functional Capacity Evaluations.  It is my professional opinion, that Mr. Donnelly and FedEx have demonstrated a lack of meaningful dialogue and serious attempts to resolve the return to work issues that pertained to Mr. Verrocchio during August and September 2007.

The opinions contained in this report are within a reasonable degree of vocational certainty.  They are based on 2-3 hours of time spent evaluating Gabriele E. Verrocchio, review of the records provided, research utilizing resources widely accepted within the field of vocational rehabilitation and 38 years of experience in the field of physical and vocational rehabilitation.

I trust that this report serves to answer your employment related questions regarding Mr. Verrocchio.  If I may be of further assistance, please feel free to contact me at your convenience.

Sincerely,

Alan C. Winship, MS Ed, CRC, D-ABVE, CLCP
Licensed Mental Health Counselor
Fellow-American Academy of Pain Management

# PHYSICAL DEMAND DEFINITIONS

**Sedentary Work**
Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

**Light Work**
Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

**Medium Work**
Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical demand requirements are in excess of those for Light Work.

**Heavy Work**
Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 t0 20 pounds of force constantly to move objects. Physical demand requirements are in excess of those for Medium Work.

**Very Heavy Work**
Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical demands are in excess of those for Heavy Work.

## FREQUENCY OF TASK

| | |
|---|---|
| **Occasionally** | Up to 1/3 of work day. |
| **Frequently** | From 1/3 to 2/3 of time. |
| **Constantly** | More than 2/3 of time. |

**Source:** U. S. Department of Labor, The Revised Handbook for Analyzing Jobs, 1991.

# Winship & Associates
### 40 Gardenville Parkway, Suite 200
### West Seneca, New York 14224

Alan C. Winship
Rheannon K. Yuscinsky

August 30, 2010

Feyi O. Gaji
Attorney At Law
36 Oak Street
Binghamton, New York 13905

Dear Mr. Gaji:

I have not published any materials within the past 10 years.

In the last 4 years I have provided testimony in the following cases:

| Date | Case | Court |
|---|---|---|
| 9/19/06 | Bonds | New York State Supreme Court, Erie County |
| 10/05/06 | Bobek | Beaver County, Pennsylvania |
| 12/11/07 | Campopiano | New York State Supreme Court, Monroe County |
| 1/16/08 | Wood | New York State Supreme Court, Monroe County |
| 1/30/08 | Wittmer | New York State Supreme Court, Erie County |
| 2/21/08 | Packard | New York State Supreme Court, Erie County |
| 4/15/08 | Stiglmier | New York State Supreme Court, Erie County |
| 4/25/08 | Keels | New York State Supreme Court, Erie County |
| 8/05/08 | Raskin-Weber, Jillian | Court of Claims |

Winship Testimony
Page 2
August 30, 2010

9/15/08    Meiler
New York State Supreme Court, Erie County
10/28/08    Springs, Jr., Arthur
New York State Supreme Court, Erie County
1/12/09    Guerin, Kevin
New York State Supreme Court, Erie County
3/25/09    Roosa, Daniel
New York State Supreme Court, Wayne County
6/12/09    Wells, Jeffrey
New York State Supreme Court, Monroe County
12/10/09    Armagost, Fred
New York State Supreme Court, Niagara County
1/20/10    Farrow, Erika
New York State Supreme Court, Niagara County
5/05/10    McCarthy, Shawn
New York State Supreme Court, Erie County
5/19/10    Martinez, Daniel
New York State Supreme Court, Erie County
6/28/10    Staub, Paul
New York State Supreme Court, Niagara County

My professional rate is $370 per hour (through Expert Resources Inc.).
Testimony is provided at a rate of $2,700 per half day plus travel and
expenses (through Expert Resources Inc.). Please advise if you will need
additional information.

Sincerely,

Alan C. Winship, MS Ed, CRC, D-ABVE, CLCP
Licensed Mental Health Counselor
Fellow-American Academy of Pain Management

## ALAN C. WINSHIP
40 Gardenville Parkway, Suite 200
West Seneca, New York 14224
(716) 668-3710

**EDUCATION:**

|  |  |
| --- | --- |
| M.S. Ed. Community Counseling | 1999 |
| St. Bonaventure University | |
| | |
| Bachelor of Arts, Psychology | 1982 |
| State University of New York at Buffalo | |
| Graduate courses in Rehabilitation Counseling | 1984-1986 |

**EMPLOYMENT HISTORY:**

<u>Winship & Associates</u>                                                    6/91 – Present
40 Gardenville Parkway, West Seneca, New York 14224
**President:** Providing and supervising vocational rehabilitation services, including vocational assessment, testing, job development, labor market survey, job analysis, job modification consultation and transferable skills assessment. Vocational expert testimony in Social Security, liability, discrimination and ADA related cases. Life Care Planning. Training programs for workplace violence, sexual harassment, hostile workplace and anger management.

<u>Industrial Intervention Services, Incorporated</u>                6/92 - 2005
60 Innsbruck Drive, Cheektowaga, New York 14227
**Partner:** Providing ergonomic consulting in manufacturing, office and health care settings. In depth training for individuals or groups in office ergonomics, including voice input systems, seating and adaptive equipment needs.

<u>ConServCo</u>                                                                  3/86 - 6/91
40 LaRiviere Drive, Buffalo, New York 14202
**Sr. Rehabilitation Consultant:** Responsible for supervision and case management activities to include: medical coordination, vocational assessment and exploration, job development, labor market survey and employability assessment. Expert vocational assessment for Social Security and liability cases.

<u>Comprehensive Rehabilitation Associates</u>                      5/81 - 3/86
609 Dingens Street, Buffalo, New York 14206
**Rehabilitation Specialist:** Provided medical care coordination and vocational rehabilitation services.

Alan Winship
Page 2

Buffalo General Hospital                                                6/72 - 5/81
100 High Street, Buffalo, New York  14201
**Assistant Physical Therapist:** Instructed patients in
  gait training and therapeutic exercise.

United States Army                                                     8/69 - 2/72
  Vietnam Era Veteran.  Trained and served as a
  medical corpsman and assistant physical therapist.

## CERTIFICATIONS/LICENSES:

New York State License – Mental Health Counselor
License Number:      000658

Certified Rehabilitation Counselor
Certification Number:      00004356

American Board of Vocational Experts – Diplomat
Certificate Number:      64102

Certified Life Care Planner
Certification Number:      0298

American Academy of Pain Management – Fellow
Certificate Number:      8261

Certified Case Manager
Certification Number:      00004356

New York State License - Assistant Physical Therapist
License Number:      486 inactive status

## GROUPS/MEMBERSHIPS:

International Association for Rehabilitation Professionals
  New York State Chapter Past President
North American Brain Injury Society
American Counseling Association
American Rehabilitation Counseling Association
American Academy of Pain Management

## ADJUNCT FACULTY/PRACTICUM SUPERVISOR:

State University of New York at Buffalo
  Department of Counseling, School and Educational Psychology

## ADVANCED TRAINING

Intellicus/University of Florida - Life Care Planning
Intellicus/Mild Traumatic Brain Injury - Life Care Planning      1997
Intellicus/Chronic Pain Management - Life Care Planning          2001
Intellicus/Technology For the Technology Dependent Client        2002
                                                                 2005

# VOCATIONAL REFERENCES

U.S. Department of Labor Bureau of Labor Statistics (Sept. 1999). Employment & Earnings.

JIST Works, Inc. (1993). The Complete Guide for Occupational Exploration.

JIST Works, Inc. (1998). The O*NET Dictionary of Occupational Titles.

New York Department of Labor. Monthly statistical report. Labor Area Summary.

New York Department of Labor. Employment Newsletter for New York State. Employment in New York State.

New York Department of Labor (1996). Information regarding occupational trends and local labor supply and demand. Tomorrow's Jobs Tomorrow's Workers.

U.S. Department of Commerce (1998). Bureau of the Census. Money Income in the U.S. Current Population Reports. Consumer Income. Series P-60-200.

U.S. Department of Labor, Employment and Training Administration (1991). The Revised Handbook for Analyzing Jobs.

U.S. Department of Labor. Occupational Outlook Handbook. 2009-2010 Edition.

U.S. Department of Labor (1991). Dictionary of Occupational Titles, Volume I and II, Fourth Edition, Revised.

Elliott & Fitzpatrick (2001). Rehabilitation Consultant, Handbook - Revised. Weed & Field.

Elliott & Fitzpatrick (1999). Classification of Jobs 2000.

Deutsch & Sawyer. A Guide to Rehabilitation. AHAB Press.

Deutsch & Fralish. Innovations in Head Injury Rehabilitation. AHAB Press.

Richards. Life & Work Life Expectancies. Lawyers & Judges Publishing Company.

Bryant, Zick & Kim. The Dollar Value of Household Work - Revised Edition 1993. Cornell University.

New York State Department of Labor Website.

Herr & Cramer. Career Guidance & Counseling Through the Life Span. 1988. Scott, Foresman Company.

VOCATIONAL REFERENCES
Page 2

McCollister, & Pluaum.  Measuring the Effect of Disability on Worklife and Earnings. Spectrum Economics, Inc.

Pflaum, McCollister, Shavelle, Straus & DeVivo (2003). Disability and Worklife: The Case of Spinal Cord Injury.  Spectrum Economics, Inc.

Smith (2004), Disability and Retirement: The Early Exit of Baby Boomers from the Labor Force, Congressional Budget Office

2004, Disability Status Reports United States, Cornell Univ. Rehabilitation Research and Training Center on Disability Statistics.

New York State Dept. of Labor Analysis of Occupational Projections and Wages by Education and Training Requirements, New York State, July 2007

U.S. Chamber of Commerce 2008 Employee Benefits Study

Bureau of Labor Statistics.  Employer Costs For Employee Compensation For  The Regions September 2008

Upjohn Institute Special Issue: National Labor Market Policy, July 2009